OPINION
{¶ 1} Appellant, Lisa J. Henry, appeals from the August 20, 2007 and August 22, 2007 judgment entries of the Lake County Court of Common Pleas, denying her motion for new trial and sentencing her to aggravated arson, aggravated murder, murder, and endangering children.
 {¶ 2} On October 25, 2006, appellant was indicted by the Lake County Grand Jury on six counts: count one, aggravated arson, a felony of the first degree, in violation of R.C. 2909.02(A)(1); count two, aggravated murder, in violation of R.C. 2903.01(A); *Page 2 
count three, murder, in violation of R.C. 2903.02(B); and counts four, five, and six, endangering children, misdemeanors of the first degree, in violation of R.C. 2919.22(A). On October 27, 2006, appellant filed a waiver of her right to be present at the arraignment and the trial court entered a not guilty plea on her behalf.
 {¶ 3} On November 15, 2006, appellant filed a waiver of her right to a speedy trial, withdrew her former not guilty plea, and entered a plea of not guilty by reason of insanity to all charges in the indictment. In its November 27, 2006 judgment entry, the trial court appointed the Adult Probation Department to carefully examine appellant pursuant to R.C. 2945.39 and 2945.371 on the issues of competency and sanity.
 {¶ 4} On February 1, 2007, appellee, the state of Ohio, filed a motion for a psychological evaluation pursuant to R.C. 2945.371, which was granted by the trial court on the following day. On February 7, 2007, appellant filed a brief in opposition to the state's motion for a psychological evaluation and a motion to strike the trial court's February 2, 2007 judgment entry. The state filed a response on February 13, 2007. Pursuant to its February 20, 2007 judgment entry, the trial court denied appellant's motion to strike its February 2, 2007 judgment entry.
 {¶ 5} A competency hearing was held on April 4, 2007. Pursuant to its April 13, 2007 judgment entry, the trial court found appellant competent to stand trial.
 {¶ 6} On July 13, 2007, appellant withdrew her plea of not guilty by reason of insanity to counts two through six, and entered a plea of not guilty as to those counts. Appellant's plea with respect to count one, however, remained as not guilty by reason of insanity.
 {¶ 7} A jury trial commenced on July 16, 2007. *Page 3 
 {¶ 8} At the trial, the facts revealed that eleven people lived in the Henry residence on Parmly Road in Perry Township, Lake County, Ohio. Appellant and her husband, John Henry ("John"), were the heads of the household. Their three children, John Jr., Crystal, and Michael all resided with them. John Jr. was married and he and his wife, Jennifer, lived at the home with their four children. Also, Crystal, who was in the process of separating from her husband, Joseph Schuldheis ("Joe"), had a child who lived at the residence.
 {¶ 9} Appellant's and John's child, Michael, who was twenty-six years old at the time of the incident at issue, had cerebral palsy and was mainly confined to his bedroom where he slept on the floor on an air mattress. Michael had the ability to crawl and make noises but could not walk, sit up or talk on his own.
 {¶ 10} Out of all of the adults in the Henry household, appellant was the only one that did not have a job. She was responsible for getting the older children off to school as well as caring for her three young granddaughters and Michael. Appellant was a good homemaker and took care of the other family members as well.
 {¶ 11} Joe testified for the state that because of the marital problems he and Crystal had, she moved back into her parents' home. Joe and Crystal argued frequently. The night before the incident, Joe called the Henry residence repeatedly and made threats to Crystal. According to Joe, he told Crystal that a complaint should be made to Human Services regarding the poor manner in which Michael was being treated.
 {¶ 12} On the morning of September 13, 2006, the working adults left for their jobs and appellant got the older kids off to catch the school bus. John, while at work at *Page 4 
Mentor Lumber, received a phone call from appellant to hurry home before it was too late. John testified for appellant that he raced back to find his house ablaze. He tried to enter Michael's bedroom, which was in the center of the home, but the heat and smoke were too intense. The bathroom door was locked, so John kicked it in to find appellant apparently lifeless in the bathtub. John called 9-1-1. He carried appellant out and was also able to retrieve the three young granddaughters from the house to safety.
 {¶ 13} At approximately 9:30 a.m., the Lake County Sheriffs Department ("LCSD") and the Perry Fire Department ("PFD") were dispatched to the residence. Firefighters attempted firefighting and rescue efforts and paramedics assisted appellant, who had cuts on the tops of both her hands which were bleeding. Patrick Fuerst, a lieutenant with the PFD, testified for the state that appellant said she wanted to die and wanted her and Michael to be with her deceased mother.
 {¶ 14} Appellant was taken to the hospital where she was treated for wounds to the top of her hands and suffered a severed tendon. She was released shortly after treatment, and taken to the LCSD where she was interviewed. Scott Stranahan ("Detective Stranahan"), a detective with the LCSD, testified for the state that appellant told him and other deputies that she wanted to be in heaven with her mother.
 {¶ 15} Efforts to rescue Michael were unsuccessful. Michael's corpse was ultimately found three to four feet from the bedroom door under debris. Stranahan and Chuck Hanni ("Hanni"), an arson investigator with the Ohio State Fire Marshall's Office, testified for the state that Michael appeared to have been lying on a blanket, there was a comforter by his side, and newspapers were piled along the side of his body. Also, a gas can was in Michael's vicinity and an odor of accelerant was detected. *Page 5 
 {¶ 16} Michael Reed, a lieutenant with the LCSD, testified for the state that an initial walk through of the residence after the fire had been suppressed revealed an apparent suicide note written by appellant. At that time, the LCSD contacted the Lake County Prosecutor's Office to obtain a search warrant.
 {¶ 17} According to Hanni, during the initial walk through, he observed a line of demarcation which indicated how far the soot and gases had banked down before the fire was extinguished. Hanni indicated that a gas can was found near Michael's body, along with the remains of a comforter, portions of a blanket which were partially underneath him, and some newspapers stacked along his left side. Hanni was able to detect an odor of accelerant on the newspapers found alongside Michael's body. From his observations, Hanni determined that the fire originated in Michael's bedroom on the floor level near the lower half of his body, which was evidenced from the bloom pattern on the ceiling. Hanni testified that when Michael's body was placed in a body bag, he noticed a foam cone in his mouth.
 {¶ 18} Upon obtaining a search warrant, the LCSD recovered a gas can, an apparent suicide note, a blanket, comforter, newspapers which surrounded Michael's body, a playpen and swing, blood evidence, a sharp blade found near the bathtub, and appellant's clothing. Accelerants were later found on the newspapers, blankets, and gas can.
 {¶ 19} On the day following the incident, Dr. William Bligh-Glover ("Dr. Bligh-Glover"), Lake County Forensic Pathologist, testified for the state that he performed an autopsy on Michael's body. According to Dr. Bligh-Glover, Michael's remains were completely covered with soot and there were extensive third and fourth degree burns *Page 6 
over seventy percent of his body. Michael's lower legs were completely destroyed by the fire. Internal examination of his upper airways revealed a grayish color including the area in his trachea which would normally be pink. He found no sign of disease or illness. Dr. Bligh-Glover opined that Michael died of asphyxiation due to his involvement in a flash fire, and that his windpipe was damaged by superheated gases below the vocal chords indicating that he inhaled those gases. The official cause of death was determined to be homicidal violence. Dr. Bligh-Glover stressed that there was simply nothing to indicate that Michael died from natural causes. He stated that many things can cause a foam cone, but ultimately it is caused from damage to the airways when fluid that keeps the cells wet leaks out and air passes over the fluid so that it whips into a froth. Dr. Bligh-Glover said that a person must be living to form a foam cone. Presence of the foam cone was additional evidence leading him to believe that Michael was alive at the time of the fire.
 {¶ 20} On cross-examination, Dr. Bligh-Glover agreed that elevated carbon monoxide levels and soot in the airway are the time-honored scientific findings used to determine if someone was alive during a fire, but while acknowledging that that is most often the case, stated that it is not always the case. He indicated the difference was that Michael died in a flash fire.
 {¶ 21} Dr. Heather Nielson Raaf ("Dr. Raaf"), retired Chief Deputy Coroner with the Cuyahoga County Coroner's Office, testified for the state that she reviewed Dr. Bligh-Glover's autopsy findings as well as all of the photographs and investigations. She agreed that as a result of those findings, Michael did not die of natural causes. Dr. Raaf found the foam cone significant and concurred with Dr. Bligh-Glover that it occurs *Page 7 
in a living person who is sometimes in a fire. She explained that a foam cone occurs when someone is actively dying. Dr. Raaf opined that Michael died very quickly due to lack of oxygen. She stated there was no evidence that Michael died of a seizure or pneumonia.
 {¶ 22} Dr. Charles Yowler, Director of the Burn Unit at MetroHealth Medical Center in Cleveland, Ohio, testified for appellant that it was his opinion that the finding of normal carbon monoxide levels and lack of soot below the vocal chords was not consistent with Michael being alive at the time of the fire.
 {¶ 23} Dr. James Dibdin ("Dr. Dibdin"), who is licensed in California and certified in anatomic and forensic pathology, testified for appellant that it was his opinion that Michael died of a seizure and a fatty liver. Dr. Dibdin believed that Michael was not alive at the time of the fire due to the normal carbon monoxide levels and lack of soot in his airways.
 {¶ 24} According to appellant, at first, she had little recollection on the morning of the incident. However, some of her memories had come back. For instance, appellant recalled going into Michael's bedroom, finding his body cold, and later waking up in the hospital. She had no recollection of writing a suicide note or starting the fire.
 {¶ 25} Dr. Phillip Resnick ("Dr. Resnick"), who is board certified in forensic psychiatry, testified for appellant that he interviewed her and several of her family members days and months following the incident. A few days after the incident, Dr. Resnick stated that appellant did not remember much regarding that morning, and he found her amnesia to be genuine. Months later, he indicated that appellant regained part of her memory and remembered finding Michael dead that morning, but did not *Page 8 
remember writing a suicide note or starting the fire. Dr. Resnick opined that appellant was suffering from a severe mental disease at the time of the incident which was a major depressive episode with dissociative features.
 {¶ 26} Dr. Jeff Rindsberg ("Dr. Rindsberg"), a state rebuttal witness with the Lake County Probation Department, testified that he believed appellant suffered from major depressive disorder. However, he opined that it was not a severe mental disease and it did not bear on her ability to know right from wrong. Dr. Rindsberg stated that appellant had no traits or features associated with dissociative conditions.
 {¶ 27} Finally, Dr. James Eisenberg ("Dr. Eisenberg"), a state rebuttal witness engaged in the field of forensic psychology, testified that he believed appellant was depressed and suffered from dissociative features, but that she knew the wrongfulness of her actions. Dr. Eisenberg stated that no one could have an opinion as to appellant's mental state at the time because of her amnesia.
 {¶ 28} On July 25, 2007, following the trial, the jury returned a verdict finding appellant guilty on all charges in the indictment. The trial court deferred sentencing until a later date and referred the matter to the Adult Probation Department for a presentence investigation and report as well as an updated psychological evaluation.
 {¶ 29} On August 3, 2007, appellant filed a motion for new trial pursuant to Crim. R. 33. The state filed a response on August 10, 2007.
 {¶ 30} Pursuant to its August 20, 2007 judgment entry, the trial court denied appellant's motion for new trial.
 {¶ 31} A sentencing hearing was held on August 22, 2007. Pursuant to its August 22, 2007 judgment entry, the trial court sentenced appellant to three years in *Page 9 
prison on count one; life imprisonment with parole eligibility after serving twenty years of mandatory imprisonment on count two; count three merged into count two for purposes of sentencing; six months on count four; six months on count five; and six months on count six. The trial court indicated that count one is to run consecutive to count two, and counts four, five, and six are to run concurrent with each other and with count two, for a total term of twenty-three years to life in prison. Appellant was given three hundred forty-four days of credit for time already served. The trial court notified appellant that post release control is mandatory for five years.
 {¶ 32} It is from the foregoing August 20, 2007 and August 22, 2007 judgment entries that appellant filed a timely notice of appeal, asserting the following six assignments of error for our review:
 {¶ 33} "[1.] The appellant was denied her Sixth Amendment right to the effective assistance of counsel when defense counsel failed to perform as a reasonably competent advocate before and during trial.
 {¶ 34} "[2.] The appellant was denied her constitutional right to a fair trial under the Sixth and Fourteenth Amendments because of prosecutorial misconduct at trial and during closing argument.
 {¶ 35} "[3.] The appellant was denied her rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments when the court committed clear error in his rulings, causing significant unfair prejudice to the appellant.
 {¶ 36} "[4.] The jury's decision finding the appellant guilty of either homicide charge was not supported by sufficient evidence. *Page 10 
 {¶ 37} "[5.] The jury's decision finding appellant guilty of the charges was against the manifest weight of the evidence.
 {¶ 38} "[6.] The trial court erred and violated appellant's Fifth Amendment right to be free from double jeopardy when it ordered consecutive service for allied-offenses."
 {¶ 39} FIRST ASSIGNMENT OF ERROR:
 {¶ 40} In her first assignment of error, appellant argues that she was denied her Sixth Amendment right to effective assistance of counsel because her counsel failed to perform as a reasonably competent advocate before and during trial. Appellant presents the following nine issues for our review:
 {¶ 41} "1. Whether it constituted ineffective assistance for trial counsel to fail to move to suppress the oral statements made by [appellant] during her custodial interview by detectives.
 {¶ 42} "2. Whether it constituted ineffective assistance of counsel for the defense attorney to fail to file a motion to suppress the evidence seized in and stemming from the warrantless search of [appellant's] home.
 {¶ 43} "3. Whether it constituted ineffective assistance of counsel to fail to challenge the coroner's verdict and testimony as lacking in foundation in violation of Evid. R. 702.
 {¶ 44} "4. Whether it constituted ineffective assistance of counsel to fail to object to the testimony of the State's psychiatric expert, who could not offer an opinion as to [appellant's] sanity at the time of the act, but merely criticized and attempted to discredit the opinion of the defense psychiatric expert. *Page 11 
 {¶ 45} "5. Whether it constituted ineffective assistance of counsel for the trial attorney to have been completely unaware that 1) videotaping the psychiatric evaluation of [appellant] could make the lengthy recorded interview subject to discovery and 2) if [appellant] testified she would be impeached with statements she made in the evaluation.
 {¶ 46} "6. Whether it constituted ineffective assistance for the trial counsel to fail to object to the pervasive misconduct of the Prosecutor during trial.
 {¶ 47} "7. Whether it constituted ineffective assistance of counsel for the trial attorney to fail to inform the trial court of Evid. R. 803(18), which allows the use of learned treatises as substantive evidence at trial, instead of relying on the trial court's mistaken notion that `Ohio is not a treatise state.'
 {¶ 48} "8. Whether it constituted ineffective assistance of counsel for the trial attorney to fail to keep track of the exhibits that were offered, allowing many improper exhibits to go to the jury and [appellant's] to be left out.
 {¶ 49} "9. Whether it constituted the ineffective assistance of counsel for a trial attorney who was inexperienced in handling criminal cases to accept a case of this seriousness and complexity and handle it on his own without assistance."
 {¶ 50} Preliminarily, we note that Strickland v. Washington (1984),466 U.S. 668, 687 states:
 {¶ 51} "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction *** has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' *Page 12 
guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction *** resulted from a breakdown in the adversary process that renders the result unreliable."
 {¶ 52} "*** When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-688. State v. Bradley (1989),42 Ohio St.3d 136, 142, quoting Strickland, supra, at 694, states: "[t]o warrant reversal, `(t)he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"
 {¶ 53} Very few criminal cases are reversed on the basis of an ineffective assistance of counsel claim due to the fact that there is no clear standard on what dictates "trial strategy." The present standard as set forth in Strickland sets a broad standard for lawyer competency. Under Strickland and its interpretation by Ohio courts, the mere possession of a law license, regardless of experience or criminal defense training, and the most tenuous and reckless of trial strategies, renders counsel effective.
 {¶ 54} In a civil context, on the other hand, in order to establish a cause of action for malpractice, a reasonableness standard is used in which a plaintiff must establish a tripartite showing: "an attorney-client relationship giving rise to a duty, a breach of that *Page 13 
duty, and damages proximately caused by the breach." Savage v.Kucharski, 11th Dist. No. 2005-L-141, 2006-Ohio-5165, at ¶ 30, citingVahila v. Hall (1997), 77 Ohio St.3d 421, syllabus.
 {¶ 55} In order to prevail on a claim of ineffective assistance of counsel, the defendant has the burden to establish two things: (1) that counsel's performance was deficient, and (2) that counsel's deficiency prejudiced the defense. State v. Reynolds (1998), 80 Ohio St.3d 670,674, citing Strickland, supra, at 687. The defendant must produce evidence that counsel acted unreasonably by substantially violating essential duties owed to the client. State v. Sallie (1998),81 Ohio St.3d 673, 674.
 {¶ 56} A criminal defense attorney owes a duty of care to his client. A "duty" is defined as "[a] legal obligation that is owed or due to another and that needs to be satisfied; an obligation for which somebody else has a corresponding right." Black's Law Dictionary (8 Ed. 2004) 543.
 {¶ 57} Under Strickland as interpreted by Ohio courts, attorneys are presumed competent, reviewing courts must refrain from second-guessing strategic, tactical decisions and strongly presume that counsel's performance falls within a wide range of reasonable legal assistance.State v. Carter (1995), 72 Ohio St.3d 545, 558. See, also, State v.Burley (Aug. 11, 1998), 7th Dist. No. 93-CA-204, 1998 Ohio App. LEXIS 3895, at 9 (a defendant is not guaranteed the right to the best or most brilliant counsel).
 {¶ 58} Upon demonstrating counsel's deficient performance, the defendant then has the burden to establish prejudice to the defense as a result of counsel's deficiency. Reynolds, supra, at 674. The reviewing court looks at the totality of the evidence and decides if there exists a reasonable probability that, were it not for serious errors made, *Page 14 
the outcome of the trial would have been different. Strickland, supra, at 695-696. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Id.
 {¶ 59} An attorney has a duty to zealously represent a criminal defendant. "Criminal defense is an art, not a science. Criminal defense attorneys adopt different approaches to their craft, based partly upon the demands of the particular case, and partly upon their own personal characteristics. Ordinarily, defense counsel's particular style of defense is not a basis for a claim of ineffective assistance of counsel." State v. Benton (Jan. 20, 1993), 2d Dist. No. 91 CA 71, 1993 Ohio App. LEXIS 172, at 7. Ohio Rule of Professional Conduct 1.1 prohibits a lawyer from representing a client in a legal matter that the lawyer is professionally incompetent to manage. In reading an appellate record, counsel's experience, or lack thereof, in trying a particular type of criminal case becomes evident.
 {¶ 60} Under the present Strickland analysis, "trial strategy" becomes a constantly moving subjective standard of "Monday morning quarterbacking" and appellate guesswork as to what strategy was employed, wherein any level of reckless trial practice is considered effective for purposes of guaranteeing an accused the right to effective assistance of counsel, if that defendant cannot prove prejudice in a post trial analysis. The reviewing court requirement of evaluating "prejudice", "after the horse has left the barn," belies the goal of objective evaluation. It is impossible to pretend that you have no knowledge of presented evidence after you have heard that evidence, you know it exists, and it has been admitted. In fact, the second prong ofStrickland requires the "but for" showing of prejudice, retrospectively. It is like reading the ending to a novel *Page 15 
before you read the book. Facts and events in the story take on new meaning that may not have been relevant before or at trial. It makes it much easier to justify a conviction and does not represent a true picture of the jurors' process of deciding guilt. The presentStrickland analysis creates a conflict between the objective reasonable requirements of the first prong of the analysis, and the subjective remedy of the second prong, which results in establishing a broad standard for competency which at some point interferes with the defendant's right to a fair trial and right to counsel.
 {¶ 61} "The rights of indigent defendants to appointment and effective assistance of counsel are neither lofty philosophical ideals nor rights that only function to give us all faith in the criminal justice system. *** The rights to appointment of counsel and to effective assistance ultimately impact not only whether people are convicted of crimes based on fair processes but moreover, whether innocent people are convicted of crimes they did not commit. These are both outcomes whose probabilities should be reduced whenever and however feasible." Note, The Paper Tiger of Gideon v. Wainwright and the Evisceration of the Right to Appointment of Legal Counsel for Indigent Defendants (2005), 3 Cardozo Pub.L, Policy EthicsJ. 495, 500. (Footnote omitted.)
 {¶ 62} Strickland and its Ohio progeny, although black letter law, with their broad standard for effective assistance of counsel, do not serve this purpose. There is an illogical correlation between our present ineffective assistance standard as applied and our goal of fair process and not convicting innocent people and insuring the right to counsel as constitutionally guaranteed. What is the hidden cost of convicting innocent people to the taxpayer, to the defendant, to the state that inevitably pays for the new trial, to the citizenry's confidence in the judiciary and the criminal justice system? With *Page 16 
the advent of modern science we now know, objectively, that things have changed since Strickland was adopted. DNA evidence and the National Innocence Project have highlighted the weaknesses in the present methodology of administering justice.
 {¶ 63} The record on appeal in this matter, in which certain evidence was not presented, certain evidence was not excluded or asked to be excluded, certain motions were not filed, certain defenses and objections were asserted on some counts but not others, resulting in inconsistent evidentiary submissions, and a tenuous trial strategy, illustrates the need for the legislature or the Supreme Court of Ohio to implement minimum standards for representation of the criminally accused.
 {¶ 64} In affirming the trial court, we now turn to appellant's nine issues regarding claims of ineffective assistance of counsel under her first assignment of error.
 {¶ 65} FIRST ISSUE:
 {¶ 66} With respect to her first issue, we disagree with appellant that her counsel was ineffective by failing to move to suppress oral statements made by her during her custodial interview due to the fact that she was properly given, but waived, her Miranda rights.
 {¶ 67} "*** [A]ccording to Strickland, the possibility that a suppression motion would have been granted does not prove there exists a reasonable probability that, but for counsel's omission, the result would have been different. *** Hence, to establish prejudice, an appellant must prove more than a mere possibility that the motion could have been granted; rather, he or she must show a reasonableprobability that, but for the omission, the result of the proceedings would have been different." State v. Delmonico, 11th Dist. No. 2003-A-0022, 2005-Ohio-2902, at ¶ 20. (Footnote omitted.) *Page 17 
(Emphasis sic.)
 {¶ 68} On the morning at issue, appellant was taken to the LCSD and interviewed by two detectives. The fourteen minute interview was audio taped and played for the jury. Although she was in custody, the record establishes that she was advised of her Miranda rights and waived those rights. A deputy signed the Miranda waiver form on her behalf and at her direction, because the bandages on her hand prevented her from signing it herself. The audio tape reveals that appellant was tired, yet responsive to the detectives' questions. We note that "mere fatigue on the part of a suspect does not equate to coercive conduct by the police, absent evidence that the suspect's willpower is overborne." State v.Henry, 11th Dist. No. 2007-L-082, 2007-Ohio-6732, at ¶ 51.
 {¶ 69} The interview was conducted in a non-coercive manner. Appellant did not ask any questions with respect to her Miranda rights, did not indicate that she did not wish to answer any questions, nor did she ask to speak with an attorney. Appellant mainly said that she did not remember what happened that morning, which is consistent with her later testimony. As soon as her "tiredness" began to interfere with the interview, it was concluded by the detectives. The record here does not establish that appellant's counsel was ineffective by failing to move to suppress the oral statements made by her during the custodial interview.
 {¶ 70} Appellant's first issue is without merit.
 {¶ 71} SECOND ISSUE:
 {¶ 72} With regard to her second issue, we disagree with appellant that her counsel was ineffective by failing to file a motion to suppress the evidence seized in and *Page 18 
stemming from the warrantless search of her home. A search warrant was not necessary at the time that investigators remained on the premises to investigate the cause of the fire after it had been extinguished. The record demonstrates that when it was safe to enter the home, but while smoke still filled the air, investigators walked through appellant's residence, remained for a reasonable time period, and saw in plain view a gas can and an apparent suicide note. A warrant was later obtained, allowing for a thorough search of the residence and removal of evidence.
 {¶ 73} The United States Supreme Court held that "an entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." Michigan v. Tyler (1978), 436 U.S. 499, 511.
 {¶ 74} Here, a search warrant was not required for the initial, prompt investigation of the scene. Appellant fails to demonstrate that her counsel was ineffective since there is no reasonable probability that a motion to suppress on this issue would have been successful.
 {¶ 75} Appellant's second issue is without merit.
 {¶ 76} THIRD, FOURTH, AND SIXTH ISSUES:
 {¶ 77} Because appellant's third, fourth, and sixth issues focus on a failure to object, for ease of discussion, we will address them together.
 {¶ 78} Trial tactics (including a failure to object) do not substantiate a claim of ineffective assistance of counsel. *Page 19 
 {¶ 79} With respect to appellant's third issue, Dr. Bligh-Glover testified that since there was no sign of death by natural causes, based on the physical findings, Michael's death was a homicide. He indicated that many things can cause a foam cone, but ultimately it is due to damage in the airways. Dr. Bligh-Glover concluded that Michael was alive during the fire. The record establishes that Dr. Bligh-Glover's verdict was based on a suitable foundation. As such, appellant's counsel was not deficient for failing to object to Dr. Bligh-Glover's testimony as to his verdict.
 {¶ 80} Regarding her fourth issue, the record demonstrates that appellant's counsel did object to Dr. Eisenberg's report and opinion as to her sanity and again when he discredited the opinion of the defense expert. Dr. Eisenberg, a well-qualified expert in the field of forensic psychiatry and psychology, opined that while appellant suffered from mental illness, she knew the wrongfulness of her actions. Nothing prohibits Dr. Eisenberg, or any expert, from testifying about his findings as they compare to other experts. Dr. Eisenberg formed an opinion within a reasonable degree of psychological certainty as to appellant's mental state. Again, appellant's counsel did object. However, the trial court did not err by allowing Dr. Eisenberg's testimony.
 {¶ 81} With respect to her sixth issue, appellant's counsel was not ineffective for failing to object to conduct on the part of the prosecutor during trial because no misconduct occurred and the outcome was not affected. A reading of the transcript does not establish that the prosecutor's remarks and/or questions deprived appellant of a fair trial.
 {¶ 82} Appellant's third, fourth, and sixth issues are without merit.
 {¶ 83} FIFTH ISSUE: *Page 20 
 {¶ 84} With respect to her fifth issue, we disagree with appellant that her counsel was ineffective for videotaping her psychiatric evaluation. We note that the record does not show whether it was the decision of appellant's counsel or Dr. Resnick to tape the evaluation. Also, at trial, appellant took the stand on her own behalf and the videotape was never played. Appellant cannot demonstrate that her counsel was deficient and/or that she was prejudiced due to the creation of the videotape.
 {¶ 85} Appellant's fifth issue is without merit.
 {¶ 86} SEVENTH ISSUE:
 {¶ 87} Regarding her seventh issue, appellant's counsel was not ineffective because he adequately confronted witnesses against her at trial, utilizing Evid. R. 803(18).
 {¶ 88} On July 1, 2006, Ohio repealed former Evid. R. 706 and adopted new Evid. R. 803(18). Under former Evid. R. 706, learned treatises could only be used during cross-examination and only to impeach an expert witness.
 {¶ 89} Evid. R. 803(18) provides that the following are not hearsay: "To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."
 {¶ 90} This case was tried before the trial court in the aftermath of the newly adopted Evid. R. 803(18). Initially, the trial court was in error by stating that Ohio is not a *Page 21 
treatise state. Appellant alleges that her ability to confront witnesses against her was compromised by the trial court's incorrect ruling with respect to Evid. R. 803(18). She stresses that her inability to impeach Dr. Raaf with medical treatises violated her constitutional rights. However, because appellant's representative continued to impeach witnesses with treatises contrary to the trial court's initial ruling, no prejudice resulted. Here, the treatises were utilized and the hearsay statements of the treatises were presented to the jury.
 {¶ 91} Appellant's seventh issue is without merit.
 {¶ 92} EIGHTH AND NINTH ISSUES:
 {¶ 93} Because appellant's eighth and ninth issues are interrelated, we will address them in a consolidated fashion. We disagree with appellant that her counsel was ineffective due to the manner in which exhibits were offered, and that he was inexperienced in handling such a case.
 {¶ 94} First, we note that there was open discovery throughout this case. Also, in Ohio, a properly licensed attorney is presumed competent. See State v. Gondor, 112 Ohio St.3d 377, 2006-Ohio-6679, at ¶ 62. There is no evidence that appellant's counsel was incompetent. Also, there is no suggestion in the record that appellant was dissatisfied with her attorney, and, in fact, requested that he be appointed on the case.
 {¶ 95} Appellant's eighth and ninth issues are without merit.
 {¶ 96} Appellant's first assignment of error is not well-taken.
 {¶ 97} SECOND ASSIGNMENT OF ERROR:
 {¶ 98} In her second assignment of error, appellant contends that she was denied her constitutional right to a fair trial under the Sixth and Fourteenth Amendments *Page 22 
because of prosecutorial misconduct at trial during closing argument. She presents the following three issues for our review.
 {¶ 99} "1. Whether it constituted reversible misconduct for the prosecutor to introduce theories and testimony on cause of death that were not supported by reliable, scientific evidence.
 {¶ 100} "2. Whether it constituted reversible misconduct for the prosecutor to offer facts that were not in evidence to support the State's theory of the case.
 {¶ 101} "3. Whether it constituted reversible misconduct for the prosecutor to attack the defense expert with false allegations that were not made in good faith."
 {¶ 102} "`"In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial."'" State v. Goodman, 11th Dist. No. 2006-T-0130, 2007-Ohio-6252, at ¶ 50, citing State v. Maurer (1984),15 Ohio St.3d 239, 266.
 {¶ 103} With respect to prosecutorial misconduct, the Supreme Court inState v. Slagle (1992), 65 Ohio St.3d 597, 607, stated: "[w]hen we review a prosecutor's closing argument we ask two questions: `whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' State v. Smith (1984),14 Ohio St.3d 13, 14 ***. The closing argument is considered in its entirety to determine whether it was prejudicial. State v. Moritz
(1980), 63 Ohio St.2d 150, 157 ***." (Parallel citations omitted.)
 {¶ 104} "Counsel is generally given latitude during closing arguments to state what the evidence has shown and what inferences can be made by the jury." State v. Hearns, 11th Dist. No. 2002-P-0050, 2004-Ohio-385, at ¶ 15, citing State v. Davis *Page 23 
(1996), 76 Ohio St.3d 107, 117. In determining whether the prosecutor's statements affected a substantial right of the defendant, an appellate court should consider the following factors: "(1) the nature of the remarks; (2) whether an objection was made by defense counsel; (3) whether the court gave any corrective instructions; and (4) the strength of the evidence presented against the defendant." Hearns, supra, at ¶ 15, citing State v. Braxton (1995), 102 Ohio App.3d 28, 41.
 {¶ 105} FIRST ISSUE:
 {¶ 106} With respect to her first issue, we disagree with appellant that it constituted reversible misconduct for the prosecutor to introduce theories and testimony on cause of death that were not supported by reliable, scientific evidence. The record reveals that the testimony of Dr. Bligh-Glover, Dr. Raaf, and Hanni, was supported by reliable, scientific evidence and was not objected to during trial. There is no evidence that the state deliberately attempted to mislead the jury by eliciting what appellant alleges to be "junk science" opinions.
 {¶ 107} Appellant's first issue is without merit.
 {¶ 108} SECOND ISSUE:
 {¶ 109} Regarding her second issue, appellant contends that it constituted reversible misconduct for the prosecutor to offer facts that were not in evidence to support the state's theory of the case. We disagree. A review of the transcript from the prosecutor's opening statement as well as closing arguments does not reveal any misconduct. None of the state's assertions during opening statements was outside the realm of the evidence submitted. Specifically, the prosecutor correctly made reference to the fact that the coroner's office ruled out Michael's death by natural cause, which *Page 24 
was supported by the testimony of Dr. Bligh-Glover and Dr. Raaf. Dr. Raafs testimony supported the state's assertion that the presence of a foam cone proved that Michael was alive at the time of the fire. In addition, none of the state's contentions went beyond the latitude afforded either side during closing arguments, which the jury was told was not evidence.
 {¶ 110} Appellant's second issue is without merit.
 {¶ 111} THIRD ISSUE:
 {¶ 112} In her third issue, appellant maintains it constituted reversible misconduct for the prosecutor to attack Dr. Didbin with false allegations that were not made in good faith. We disagree. During cross-examination, the prosecutor accused Dr. Didbin of having a "checkered past," which included terminations. Numerous allegations were admitted and proven, but Dr. Didbin's license was not revoked.
 {¶ 113} The court in State v. Lowe, 164 Ohio App.3d 726,2005-Ohio-6614, at ¶ 10-11, stated:
 {¶ 114} "By its nature, cross-examination often involves a tentative and probing approach to testimony given on direct examination. State v.Gillard (1988), 40 Ohio St.3d 226, 231 ***. Therefore, the examiner need not lay an evidentiary foundation before posing questions upon cross-examination. It is sufficient if there is a good-faith basis to question the witness on the subject. Id.
 {¶ 115} "Where the good-faith basis for a question is not challenged at the trial level, it is presumed that a good-faith basis exists. `Since the prosecutor's good-faith basis for asking these questions was never challenged, we presume she had one(.)' *Page 25 Gillard, supra, at 231. See, also, State v. Davie (1997),80 Ohio St.3d 311, 322 ***." (Parallel citations omitted.)
 {¶ 116} Here, no objection was made by defense counsel. Therefore, we must presume that a good-faith basis for the questioning existed.Gillard, supra. We find no misconduct by the prosecutor and/or no unfair prejudice to appellant.
 {¶ 117} Appellant's third issue is without merit.
 {¶ 118} Appellant's second assignment of error is not well-taken.
 {¶ 119} THIRD ASSIGNMENT OF ERROR:
 {¶ 120} In her third assignment of error, appellant alleges that she was denied her rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments because the trial court committed clear error in its rulings, causing significant, unfair prejudice to her. She presents the following five issues for our review:
 {¶ 121} "1. Whether the trial court committed reversible, prejudicial error when it prevented defense counsel from using learned treatises as substantive evidence, as is permitted by Evid. R. 803(18).
 {¶ 122} "2. Whether the trial court committed reversible, prejudicial error in permitting numerous witnesses to testify as experts when their testimony did not appear to be reliable and scientifically valid.
 {¶ 123} "3. Whether the trial court erred and abused its discretion when its (sic) prevented defense counsel from inquiring about discussions among medical and law enforcement personnel at the autopsy after the findings indicated Michael had not died in the fire. *Page 26 
 {¶ 124} "4. Whether it constituted reversible and prejudicial error to admit numerous, heresay (sic) repetitions of statements allegedly made by [appellant] to Mr. Henry.
 {¶ 125} "5. The trial court committed reversible error when it ordered [appellant's] attorney to produce the videotape of her psychiatric examination before she put on evidence of her psychiatric condition and thereby waived the privilege."
 {¶ 126} FIRST ISSUE:
 {¶ 127} With respect to her first issue, we note that appellant already alleged this contention and we discussed it in her seventh issue under her first assignment of error. Thus, we need not address it again here.
 {¶ 128} Appellant's first issue is without merit.
 {¶ 129} SECOND ISSUE:
 {¶ 130} Regarding her second issue, the trial court did not err by permitting state witnesses to testify as experts because their testimony was reliable and scientifically valid.
 {¶ 131} Evid. R. 702 provides:
 {¶ 132} "A witness may testify as an expert if all of the following apply:
 {¶ 133} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 134} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; *Page 27 
 {¶ 135} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 136} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 137} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 138} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 139} In the case at bar, Hanni was not technically tendered as an expert on the stand, however, no objection was made by defense counsel with regard to his testimony. Dr. Bligh-Glover, Dr. Raaf, and Hanni were all qualified as experts under Evid. R. 702 because each of their testimony related to matters beyond the knowledge or experience possessed by lay persons. Also, the record establishes that each of the three was qualified as experts by specialized knowledge, skill, experience, training, and education. In addition, the testimony of Dr. Bligh-Glover, Dr. Raaf, and Hanni was based on reliable scientific, technical, or other specialized information.
 {¶ 140} Appellant's second issue is without merit.
 {¶ 141} THIRD ISSUE:
 {¶ 142} In her third issue, appellant maintains that the trial court erred by preventing defense counsel from inquiring about discussions among medical and law *Page 28 
enforcement personnel at the autopsy after the findings indicated Michael had not died in the fire. We disagree.
 {¶ 143} At the autopsy, there were at least six men present from three different agencies. Any discussion which took place regarding the results of the carbon monoxide findings was recorded in the sheriffs report. There is no evidence that any of these men worked together to develop a theory to allow them to treat Michael's death as a homicide. Sergeant Larry Harpster, with the LCSD, was asked by defense counsel if he could relay the nature of what was discussed at the autopsy. The trial court properly sustained the state's objection. Appellant did not suffer any unfair prejudice.
 {¶ 144} Appellant's third issue is without merit.
 {¶ 145} FOURTH ISSUE:
 {¶ 146} In her fourth issue, appellant alleges that it constituted reversible and prejudicial error to admit numerous, hearsay statements. We disagree.
 {¶ 147} Evid. R. 803(2), which involves hearsay exceptions, provides that an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 148} Here, Detective Stranahan testified with regard to statements made by appellant's husband, John. Based on the record, any statements John made constituted excited utterances under the hearsay exception of Evid. R. 803(2), due to the fact that his house was ablaze, he pulled out his three grandchildren and unconscious wife from the residence, his son, Michael, was still in the burning house, and he was nervous, crying, and rattled. In addition, the trial court did not err by permitting *Page 29 
Detective Stranahan to testify with respect to the statement appellant made to John during the fire that she wanted Michael to be in heaven with her and her mother.
 {¶ 149} Appellant's fourth issue is without merit.
 {¶ 150} FIFTH ISSUE:
 {¶ 151} In her fifth issue, we disagree with appellant that the trial court erred by ordering the production of the videotape from her psychiatric examination pursuant to R.C. 2945.371.
 {¶ 152} The record before us reveals that appellant's counsel, shortly after her arrest, filed a motion asking that Dr. Resnick have complete access to appellant for the purposes of a medical examination and evaluation, including having a videographer present at Dr. Resnick's discretion. The state later filed a motion for production of the videotaped interview. The trial court properly determined that the tape should be turned over to the state pursuant to R.C. 2945.371, since appellant entered a plea of not guilty by reason of insanity on the aggravated arson charge. No privilege existed.
 {¶ 153} Appellant's fifth issue is without merit.
 {¶ 154} Appellant's third assignment of error is not well-taken.
 {¶ 155} FOURTH ASSIGNMENT OF ERROR:
 {¶ 156} In her fourth assignment of error, appellant maintains that the jury's decision finding her guilty of either homicide charge was not supported by sufficient evidence. She presents the following single issue for our review:
 {¶ 157} "1. Whether there was sufficient evidence to support a homicide conviction when the physical evidence established that it was impossible for Michael to have been alive when the fire started." *Page 30 
 {¶ 158} As this court stated in State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13-14:
 {¶ 159} "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 {¶ 160} "`"(***) The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes aninquiry about due process. It raises a question of law, the resolutionof which does not allow the court to weigh the evidence. ***"`
 {¶ 161} "In other words, the standard to be applied on a question concerning sufficiency is: when viewing the evidence `in a light most favorable to the prosecution,' *** `(a) reviewing court (should) not reverse a jury verdict where there is substantial evidence upon which the jury could reasonably conclude that all of the elements of an offense have been proven beyond a reasonable doubt.' ***" (Emphasis sic.) (Citations omitted.)
 {¶ 162} "*** [A] reviewing court must look to the evidence presented *** to assess whether the state offered evidence on each statutory element of the offense, so that a rational trier of fact may infer that the offense was committed beyond a reasonable doubt." State v.March (July 16, 1999), 11th Dist. No. 98-L-065, 1999 Ohio App. LEXIS 3333, at 8. The evidence is to be viewed in a light most favorable to the prosecution when conducting this inquiry. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two *Page 31 
of the syllabus. Further, the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v.Dennis (1997), 79 Ohio St.3d 421, 430.
 {¶ 163} R.C. 2903.01(A), aggravated murder, provides in part: "No person shall purposely, and with prior calculation and design, cause the death of another ***."
 {¶ 164} R.C. 2903.02(B), murder, provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or2903.04 of the Revised Code."
 {¶ 165} In the case sub judice, the state presented sufficient evidence to support a homicide conviction, showing that it was possible for Michael to have been alive when the fire started. Dr. Bligh-Glover, Dr. Raaf, and Hanni all provided testimony demonstrating that Michael was alive at the time that appellant set the fire.
 {¶ 166} Pursuant to Schlee, supra, considering the evidence in a light most favorable to the prosecution, the jury could have found appellant guilty of homicide beyond a reasonable doubt.
 {¶ 167} Appellant's fourth assignment of error is without merit.
 {¶ 168} FIFTH ASSIGNMENT OF ERROR:
 {¶ 169} In her fifth assignment of error, appellant argues that the jury's decision finding her guilty of the charges was against the manifest weight of the evidence. She presents the following single issue for our review: *Page 32 
 {¶ 170} "1. Whether the trier of the fact clearly lost its way and created such a manifest miscarriage of justice that [appellant's] convictions must be reversed and a new trial ordered."
 {¶ 171} As this court stated in Schlee, supra, at 14-15:
 {¶ 172} "*** `[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 {¶ 173} "`In determining whether the verdict was against the manifest weight of the evidence, "(***) the court reviewing the entire record,weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (***)"' (Citations omitted.) ***" (Emphasis sic.)
 {¶ 174} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "`only in the exceptional case in which the evidence weighs heavily against the conviction.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 175} With regard to the manifest weight of the evidence, we note that the jury is in the best position to assess the credibility of witnesses. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Here, the jury chose to believe the state's witnesses. Based on the evidence presented, we cannot say that the jury clearly lost its way in finding appellant guilty of the crimes charged.
 {¶ 176} Pursuant to Schlee and Thompkins, supra, the jury did not clearly lose its *Page 33 
way in convicting appellant.
 {¶ 177} Appellant's fifth assignment of error is without merit.
 {¶ 178} SIXTH ASSIGNMENT OF ERROR:
 {¶ 179} In her sixth assignment of error, appellant alleges that the trial court erred and violated her Fifth Amendment right to be free from double jeopardy when it ordered consecutive service for allied offenses.
 {¶ 180} The Double Jeopardy Clause prohibits cumulative punishments for the same offense. See State v. Moyer, 11th Dist. No. 2007-L-108,2008-Ohio-1497, at ¶ 12.
 {¶ 181} R.C. 2941.25 provides:
 {¶ 182} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 183} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 184} The Supreme Court of Ohio recently held in State v.Cabrales, 118 Ohio St.3d 54, 2008-Ohio-1625, paragraph one of the syllabus:
 {¶ 185} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), courts are required to compare the elements of offenses in the abstract without considering the evidence in the case, but are not required to find an exact alignment of the elements. Instead, if, in comparing the elements of the offenses *Page 34 
in the abstract, the offenses are so similar that the commission of one offense will necessarily result in commission of the other, then the offenses are allied offenses of similar import. (State v. Rance (1999),85 Ohio St.3d 632, *** clarified.)" (Parallel citations omitted.)
 {¶ 186} In the instant case, appellant argues that the aggravated murder charge and the aggravated arson charge are allied offenses of similar import and must be merged. We disagree.
 {¶ 187} Again, R.C. 2903.01(A), aggravated murder, states in part: "No person shall purposely, and with prior calculation and design, cause the death of another ***."
 {¶ 188} R.C. 2909.02(A)(1), aggravated arson, provides in part: "No person, by means of fire or explosion, shall knowingly *** [c]reate a substantial risk of serious physical harm to any person other than the offender[.]"
 {¶ 189} The foregoing two offenses are not allied offenses of similar import within the meaning of R.C. 2941.25. Aggravated arson can be committed without a killing, and with aggravated murder, the state must prove that the defendant did purposely, and with prior calculation and design, cause the death of another. The commission of one offense does not necessarily result in the commission of the other.
 {¶ 190} Appellant's sixth assignment of error is without merit.
 {¶ 191} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Lake County Court of Common Pleas is affirmed. It is the further order of this court that costs are waived since appellant appears from the record *Page 35 
to be indigent. The court finds there were reasonable grounds for this appeal.
DIANE V. GRENDELL, P.J., concurs in judgment only,
CYNTHIA WESTCOTT RICE, J., concurs in judgment only with Concurring Opinion.